**Christine DIMINO, Plaintiff,**

v.

**NEW YORK CITY TRANSIT AUTHORITY, John M. Long, individually and in his official capacity as General Superintendent of the SIR/SIRTOA Police Department, Richard Dreyfus, individually and in his capacity as Deputy Executive Assistant General Counsel of the New York City Transit Authority, Staten Island Railway, Staten Island Rapid Transit Operating Authority, Staten Island Railway/Staten Island Rapid Transit Operating Authority, Defendants.**

No. 97–CV–5927(DGT).

United States District Court, E.D. New York.

Sept. 14, 1999.

Patricia Weiss, Sag Harbor, NY, for Plaintiff.

Richard Schoolman, Office of the General Counsel, New York City Transit Authority, Brooklyn, NY, for Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff, Christine Dimino ("Dimino") brings a twelve count complaint against defendants, Staten Island Railway/Staten Island Rapid Transit Operating Authority ("SIRTOA"), New York City Transit Authority ("TA"), and John Long individually and in his capacity as General Superintendent of the SIRTOA police department, alleging various charges of discrimination and retaliation based on employment disputes she, a SIRTOA Police Officer, had with her employers when she became pregnant and requested light or restricted duty. Dimino seeks damages as well as declaratory and injunctive relief. Defendants move for summary judgment dismissing all counts. Defendants move separately to strike critical portions of the evidence Dimino has submitted.

### Background

In 1997, Dimino was one of sixteen commissioned SIRTOA police officers. *See* Defs.' Local Rule 56.1 Statement (herein R.56.1) ¶ 1. SIRTOA police officers, commissioned by New York State's Superintendent of Police, carry weapons and have the authority to arrest people. *See id.* ¶ 2. Their basic duties, however, are to patrol and protect SIRTOA properties. *See id.* ¶ 3. The position can be hazardous, and plaintiff herself has been injured on the job. In June of 1996, she was struck in the lower abdomen by a falling or dislodged "ballast" while pursuing or apprehending a suspect. *See* Dimino Accident Report dated 6/20/96, Long Decl., Ex. A.

On September 17, 1997, Dimino approached her supervisor, John Long ("Long"), the Chief and General Superintendent of the SIRTOA police department, and requested that she be placed on "restricted duty" because she was pregnant. *See* Second Am. Compl. (herein "Compl.") ¶¶ 19–21. There is some dispute as to what was actually said in this conversation, as well as disagreement over what was meant by what was said. It is not disput-

ed, however, that at this time Dimino gave Long two notes. The first, a letter from Dimino herself, read as follows:

Dear Chief Long,

Attached is a letter from my physician indicating I am pregnant. It is at this time I request to be placed on restricted duty to avoid complications in my pregnancy. I am sure you would agree it would be unwise for me to take on work that would involve danger to my abdomen or an exposure to falling which could result in losing my unborn child. There is also a risk of danger to the public I protect, my fellow officers and not to mention a serious liability exposure.

Thanking you in advance for your prompt reply regarding this important matter.

Respectfully,

P.O. Christine Dimino

Pl.Ex. In Opp'n (herein "Pl.Ex.") 6.

The second note was from Dr. Arbucci, Dimino's OB/GYN. It was handwritten, but reasonably legible:

To whom it may concern:

Please be advised that Christine Dimino is pregnant her work should reflect this accordingly.

Frank Arbucci, M.D.

Pl.Ex. 7.

Defendants have represented that SIRTOA's official policy is that no "restricted" or "light" duty is available for medically limited personnel. Plaintiff contends, however, that SIRTOA's actual policy is not as defendants assert. In any case, in response to Dimino's request, Long called SIRTOA's Assistant Director of Personnel, (who was actually the head of personnel because there was no Director) AnnMarie T. Joseph ("Joseph"), who advised Long that Dimino should be sent to Transit Medical ("TMed"), a clinic operated by the TA, for an evaluation. TMed conducts medical evaluations of SIRTOA employees. *See* R.56.1 ¶ 8.

Dimino visited TMed the following day, September 18, 1997, where she was seen by Dr. Johnson who completed a "G–46" medical evaluation form. *See* Schoolman Decl., Ex. H. The form has spaces where the physician may indicate that an employee is medically qualified to perform "Full Work," "Full Work in Current Job," "Restricted Work," or "No Work." *Id.* There is evidence that TMed had been instructed not to recommend either of the middle two work categories. Joseph testified at her deposition that she and an assistant periodically go through stacks of unused G–46 forms crossing out those spaces. *See* Joseph Dep. at 23–24. Indeed, those spaces had been crossed out on the form Dr. Johnson used September 18. Dr. Johnson made no specific recommendations nor any evaluation of Dimino's work status. In the space reserved for the physician's comments, Dr. Johnson stated that he required additional information. In addition Dr. Johnson wrote a note to Dr. Arbucci:

Dear Dr. Arbucci:

Please give us a diagnosis What in your opinion the work status must be? + the basis for this. If the above client may not work—why? Please write a *note* completely answering all the above questions.[1] Give all diagnoses.

The employee's next scheduled visit is 9/25/97 Schoolman Decl., Ex. H.

On September 19, 1997, Dimino brought the G–46 form back to Long who put her on "medical leave." Long Decl. ¶ 4(b). Medical leave is unpaid. Long has represented that he was required to do this because: (1) Dimino had represented she was unfit for duty; (2) she had been sent to TMed and not been deemed ready for "Full Work" by a TA doctor; and (3) it was his understanding that SIRTOA did not assign officers restricted duty. *See id.* At that time, Dimino apparently requested a description of her duties from Long so

1. The only "above questions" are those referred to in the note itself.

that she could be evaluated pursuant to that job description. *See* Pl. Counsel Letter to Long dated 9/24/97, Pl.Ex. 10. This request was repeated in letter form by Dimino's attorney on September 24, 1997. *See id.* On September 25, 1997, or September 30, 1997, Long delivered such a description, *See* Pl.Ex. 8, but the source of the listed requirements is not clear. Plaintiff contends that the job's actual, and less onerous requirements, are laid out in a separate description. *See* Pl.Ex. 9. As far as the record shows, however, neither job description reached Dr. Arbucci before the critical events that form the basis of this lawsuit took place. Certainly, neither job description influenced a diagnosis or recommendation from Dr. Arbucci.

On September 24, 1997, Dimino presented Long and TMed with an additional handwritten note from Dr. Arbucci which was presumably in response to Dr. Johnson's note of September 18, 1997:

To whom it may concern:

Please be advised that [C]hristine may function as a Police officer I do not want her to have duties which could [unintelligible] in physical trauma to her abdomen. All other work is fine.

Frank Arbucci

9/23/97

Pl.Ex. 7.

That same day, September 24, 1997, TMed filled out a G–46 form establishing that Dimino was qualified for "No Work" for one week and scheduling another examination on October 1, 1997. Schoolman Decl., Ex. H at 4. This form appears to have been completed by a Dr. Gensor. On September 26, 1997, however, Dr. Gensor filled out an "amended copy" of the G–46 on which he checked the "Restricted Work" box. *Id.* at 5. It is not clear what prompted the need for this amendment, but it may have been in response to Dr. Arbucci's note of September 24. Dr. Gensor's diagnosis was applicable again for only one week. It should be noted that this G–46 is the only one in the record on

which the "Restricted Work" box does not have a line through it. In the space for physician comments, Dr. Gensor wrote: "Restricted duty as per private MD: Employee should avoid duties which could result in physical trauma to her abdomen." *Id.* On October 15, 1997, Dr. Gensor filled out a third G–46 form on which he repeated his restricted duty diagnosis, extended it for one month, and scheduled another visit for November 13, 1997. *Id.* at 6.

### Enter the Legal System

In the midst of Dimino's interactions with Long, SIRTOA personnel, and TMed, Dimino initiated legal action. It is not clear at what point Dimino initially retained counsel in relation to her dispute with SIRTOA; but on September 24, 1997, Dimino's counsel sent Long a letter referencing an EEOC complaint Dimino had filed two days earlier, on September 22, 1997. That complaint asserted that Dimino was able to perform all of her duties, was physically fit, would not be perceived by the public as pregnant (presumably because she was not yet "showing"), and had requested that she receive restricted duty, to which she was entitled, in the future. *See* EEOC Compl. ¶ 5, *quoted at* Compl. ¶ 58; Compl. ¶ 67. It also alleged that Dimino was being discriminated against because of her pregnancy and because she was being perceived as disabled. *See id.* at EEOC Compl. ¶ 4.

Counsel's letter to Long began with the statement that counsel "represent[ed] Christine Dimino in connection with her legal rights related to employment issues including, inter alia, her right to work as a police officer for [SIRTOA] while she [was] pregnant." Pl.Ex. 10, at 1. The letter advised Long of the EEOC complaint and reiterated the facts outlined *supra.* The letter ended as follows: "Please refer this letter to legal counsel with a request that I be contacted forthwith. This letter is written without prejudice to Officer Dimino's legal rights in the event litigation proves

necessary. We sincerely hope that will not be the case here." *Id.* at 2.

Richard Dreyfus ("Dreyfus"), an attorney for the Transit Authority, received a copy of this letter on September 26, 1997.[2] *See* Decl. of Richard Dreyfus (herein "Dreyfus Decl.") ¶ 3. That same day he spoke with "high-level SIRTOA personnel, had telephone discussions (and exchanged [versions of a letter for Dimino to sign]) with [plaintiff's counsel] . . . in an attempt to settle substantial parts of Ms. Dimino's claims." *Id.* ¶ 4. After receiving a draft of the letter, or statement, Dimino was to sign, plaintiff's counsel faxed Dreyfus a proposal for a statement using different language. Dreyfus phoned plaintiff's counsel and left a message on her answering machine informing her that her changes were not "appropriate," Dreyfus Decl. ¶ 7, and that he would leave the original statement at the station for Dimino to sign.

The statement prepared by Dreyfus stated:

> I, Christine Dimino, at the present time can perform my full duties as a police officer for the Staten Island Rapid Transit Operating Authority. I am physically and medically capable of performing these duties and hereby withdraw my request for restricted duty due to my pregnancy. Should my condition change so that I am not capable of performing my full duties as a police officer, I may submit documentation concerning my medical condition at that time for further consideration consistent with the policies of the Staten Island Rapid Transit Operating Authority.

Pl.Ex. 11 at 1.

The version plaintiff's counsel had proposed read:

> I, Christine Dimino, can perform my full duties as a police officer for the Staten Island Rapid Transit Operating Authori-

ty at the present time, just as I have performed those same duties in the past. I consider myself to be physically capable to perform the duties to which I am now assigned.

Compl. ¶ 47. Dreyfus has asserted that he rejected the counter-proposal as ambiguous because it referred to the duties to which Dimino was "now assigned" as opposed to all of the duties of a police officer. *See* Dreyfus Decl. ¶ 7.

The following day, Saturday, September 27, 1997, Dimino showed up for work. Long had called her the previous evening and informed her that she could return to work but that there would be a statement for her to sign when she arrived. Dimino does not recall whether she spoke to her counsel regarding the statement prior to arriving at work Saturday. *See* Dimino Dep. at 63. When Dimino arrived at work, Sergeant Lane, the ranking officer on duty, presented her with the statement. Dimino refused to sign it as written. Instead, Dimino crossed out all but the first sentence of the statement and, thus, signed a statement asserting:

> I, Christine Dimino, at the present time can perform my full duties as a police officer for the Staten Island Rapid Transit Operating Authority.

Pl.Ex. 11 at 2. Sergeant Lane then called Long and informed him that Dimino had refused to sign the statement as written. Long talked with Dimino on the phone and told her that if she did not sign the statement as written she could not work. Dimino continued to refuse to sign more than the first sentence, and Long ordered her to leave work.

A little more than nine months later, on June 11, 1998, Dimino apparently returned to work following what Joseph characterized as "maternity leave." Joseph Decl. ¶ 3. Defendants have asserted that, at some point in the intervening time, Dimino

---

**2.** Apparently the legal department for the New York City Transit Authority also provided legal services for SIRTOA.

apparently received Unemployment Insurance Benefits and Short Term Disability benefits. *See* Schoolman Decl. ¶ 3. It is not clear whether Dimino is presently working for SIRTOA.

## Discussion

The parties submitted this motion for summary judgment, fully briefed, on May 21, 1999. The record was later supplemented by a letter motion to strike various portions of plaintiff's evidence. Parties presented oral argument on the motion on June 8, 1999. At oral argument, the conclusions the court had tentatively reached on the basis of the papers then submitted by the parties were explained. The parties were then allowed time to dispute the conclusions with which they disagreed.

As will become evident from the following discussion, the events surrounding the statement SIRTOA provided to Dimino on September 27, 1997, are critical to many of the court's conclusions on particular counts. Defendants have argued that those events should be excluded from evidence, pursuant to Fed.R.Evid. 408, because they related to negotiations to settle or compromise a dispute and, thus, could not form the basis for a denial of summary judgment. The parties were permitted to file supplemental letter briefs on this issue. Additional evidence on this and, at the request of the court, one other issue was allowed. The evidentiary issue is addressed *infra*, part (7). The supplemental material has been considered, and the following conclusions have been reached.

### (1)

### Counts One, Eight, Nine, and Twelve— Pregnancy Discrimination

In Count One, Dimino alleges that defendants violated Title VII and the Pregnancy Discrimination Act either by not allowing Dimino to work at her job, despite the fact that she was capable of so working, or by not assigning to her to "restricted duty," when such had been available for other employees. In Count Eight, brought pursuant to 42 U.S.C.

§ 1983, Dimino alleges that defendants violated the Equal Protection Clause through the same behavior which, she alleges, was motivated by an animus toward pregnant women. *See* Compl. ¶ 126. In Count Nine, Dimino alleges that, through these same actions, defendants violated New York State Human Rights Law, New York Executive Law §§ 290–301. And, finally, in Count Twelve, Dimino alleges that defendants violated Title 8 of the New York City Administrative Code §§ 8–107, 8–107(6), 8–107(7) *et seq.* which prohibits discrimination on the basis of sex and provides for remedies. This final count seems to be based primarily on the same factors as the counts previously listed but also alludes to retaliation. *See* Compl. ¶ 146.

### (i) Defendants' refusal to let Dimino work as a police officer

Dimino contends that defendants discriminated against her by refusing to let her work as a full duty police officer, despite the fact that she was capable of doing so, solely because she was pregnant. The Supreme Court addressed the issue of pregnancy discrimination in *International Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). There, in a case in which the defendant, Johnson Controls, had instituted a policy which forbad women from working in positions that exposed them to concentrations of lead which could be harmful to a fetus and increase the possibility of miscarriage, the Court held that a policy which discriminated against fertile women, but not fertile men, violated Title VII. In so holding, the Court specifically noted that the Pregnancy Discrimination Act ("PDA") established that discriminating against an individual because of her pregnancy is sex discrimination. *See id.* at 199, 111 S.Ct. at 1203. Furthermore, in addressing the defendant's bona fide occupational qualification defense, the Court ruled that the PDA mandated that "[u]nless pregnant employees differ from others 'in their ability or inability to work,' they

must be 'treated the same' as other employees 'for all employment-related purposes.'" *Id.* at 204, 111 S.Ct. at 1206 (quoting 42 U.S.C. § 2000e(k)).

Dimino's direct evidence of discriminatory intent is largely limited to statements Long made during his deposition to the effect that he did not want her to work "[b]ecause she advised me it was unwise for me [sic] to take work on that would involve danger to my [sic] abdomen or exposure by falling which would result in losing my [sic] unborn child," Long Dep. at 107; *see also id.* at 110, and that he took her gun away because "[he] was afraid for her life and the life of her fetus." *Id.* at 132. The probative value of Long's statements, however, is diminished by the fact that Dimino herself had raised these concerns in her letter to Long. Furthermore, Long's use of the first person in his deposition testimony suggests that he was not referring to his motivation, but was instead quoting Dimino's representations. And, finally, in other portions of his deposition Long asserted that "all [he] was looking at was there was a risk of danger to the public she protected and her fellow officers [because] ... possibly she wouldn't get involved because of her pregnancy." *Id.* at 130–131. Nevertheless, while Long's equivocal statements are not definitive evidence that fetal protection was a substantial motivation for his actions, they may give rise to a question of fact with regard to his overall motivation and the possibility of discriminatory intent. *Cf. Catanzaro v. Weiden,* 140 F.3d 91, 96 (2d Cir.1998) (where two buildings occupied by minorities were demolished, evidence that mayor's policies had demolished more minority housing than it had created, that mayor knew of racial makeup of the community, and that mayor had commented that the demolition was "instant urban renewal" was sufficient to sustain equal protection claim in the face of motion for summary judgment).

Dimino has also asserted that defendants both withheld a true job description and fabricated a false job description with the purpose of convincing Dimino's doctor that she was not capable of performing her duties as a SIRTOA police officer. Dimino contends that this is additional proof of defendants' discriminatory intent. However, as noted above, it does not appear that the job descriptions ever had an impact on any doctor's evaluation. Furthermore, by October 15th, Dimino and her counsel had apparently decided that she did not wish Dr. Arbucci to make any evaluations of Dimino's ability to perform her job, despite Dimino's earlier use of the doctor for those purposes.

Finally, although not specifically raised by Dimino as evidence of discriminatory intent, Dimino has asserted that another female officer, Regina Dinkle, was given restricted duty when ill but placed on medical leave when it was discovered that the cause of her illness was pregnancy. *See* Dimino Aff. ¶ 59. Following oral argument, Dimino was permitted to supplement the record with the depositions of both Regina and Roy Dinkle, but neither deposition supported Dimino's claim. Dimino's direct evidence of discriminatory intent seems borderline at best.

Dimino's claims become somewhat more tenable, however, upon consideration of the *McDonnell Douglas* burden shifting analysis.[3] *McDonnell Douglas Corp. v.*

---

**3.** The Second Circuit has held that it will "borrow" the Title VII burden shifting analysis in determining whether conduct was unlawfully discriminatory pursuant to 42 U.S.C. § 1983. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). Similarly, discrimination claims brought under New York State or City Human Rights law also face the same standard as those brought pursuant to Title VII. *See Ferrante v. American*

*Lung Assoc.,* 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 28, 687 N.E.2d 1308 (1997); *Sowemimo v. D.A.O.R. Security, Inc.,* 43 F.Supp.2d 477, 483 (S.D.N.Y.1999). This is also true for retaliation claims brought under New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–107(7) *et seq. See Milonas v. Rosa,* 217 A.D.2d 825, 629 N.Y.S.2d 535 (3d Dept.1995). Thus, the following analysis

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*McDonnell Douglas* requires, first, that a plaintiff establish a prima facie case of discrimination. Once established, plaintiff is entitled to a presumption of discrimination, and the burden of production shifts to the defendant to provide a non-pretextual, non-discriminatory reason for its actions. If such a reason is provided, plaintiff must prove by a preponderance of the evidence that the motivation asserted by the defendant is, in fact, pretextual and that the defendant's actions were, actually, motivated by a discriminatory intent. If a plaintiff is unable to preserve a claim under Title VII, the claim will be similarly unsupportable as an equal protection claim.

▮ Under *McDonnell Douglas*, "[t]he burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the prima facie stage is de minimis." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citations omitted)(affirming district court's dismissal of Title VII action on summary judgment for failure to provide prima facie case). A prima facie case of pregnancy discrimination requires that a plaintiff show: (1) that she belongs to a protected class; (2) that she was performing her duties satisfactorily; (3) that she was discharged or suffered material adverse change in the terms or conditions of her employment; and (4) that her discharge or subjection to adverse conditions occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in the class. *See id.*

Absent any other information, to force a woman to take an unpaid medical leave from the SIRTOA police force for the full term of her pregnancy would certainly violate Title VII. *See, e.g., Johnson Controls*, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d

is decisive for all of Dimino's sex and preg-

158. Indeed, the fact that Dimino was put on medical leave at effectively the same time that she informed defendants that she was pregnant would normally be all that is needed to establish a prima facie case.

Here, however, it was Dimino who initially requested restricted duty and raised concerns about the "danger to my abdomen or an exposure to falling which could result in losing my unborn child [as well as] a danger to the public I protect, my fellow officers and not to mention a serious liability exposure." Pl.Ex. 6. If this fact does not vitiate her prima facie case, by undermining her claim that she was able to perform her duties satisfactorily, it certainly seems to provide defendants with a non-pretextual reason for putting Dimino on medical leave—to wit, not allowing employees to work after they state they are a danger to themselves or the public. Indeed, one could fairly argue that Dimino's assertion that her pregnancy presented a "serious risk" to her fetus and, therefore, required light duty work assignments indicated in and of itself that she was not mentally prepared to do those aspects of her job that posed a threat to her pregnancy, e.g., pursue a suspect.

Dimino does not directly dispute the validity of this logic; however, she asserts that defendants knew that although she was seeking restricted duty, she was willing and able to do full work, and that is what she told Long when she gave him the notes. Dimino also claims that the various documents and statements she made in September of 1997 never represented that she was not capable of full work at the time. Dimino cites her EEOC complaint, her attorney's letter of September 24, 1997, her signature on the modified statement on September 27, 1997, stating that she could perform her full duties as a police officer, and her attempts to return to full work as evidence that it was clear to defendants that she did not require "restricted duty" immediately.

nancy discrimination claims.

In support of her contention that her note reflected issues for future consideration, Dimino seems to rely on the fact that the letter closed with "thanking you in advance" and, thus, anticipated future action. *See* Dimino Aff. ¶ 5. Dimino further contends that in her initial conversation with Long, on September 17, 1997, "she openly communicated her belief she could still do her job in a safe manner just as she had for many years." *Id.* ¶¶ 10, 12.[4] Finally, Dimino argues that Dr. Arbucci's notes did not assert that she could not do full work. Dimino notes that Dr. Arbucci wrote that she "could continue to 'function as a police officer,'" Def. Mem. at 19, *quoting* Arbucci Note dated 9/23/97, Pl.Ex. 7, but ignores Dr. Arbucci's statement immediately following: "I do not want her to have duties which could [unintelligible] in physical trauma to her abdomen." Pl.Ex. 7.

■ Dimino, thus, attempts to dispute defendants' contention that it was she who initially asserted that she was unfit for work and, thereby, refute defendants' attack on her prima facie case. However, her note to Long saying: "[A]t this time I request to be placed on restricted duty" is an unqualified request for immediate restricted duty. Nevertheless, her assertion that she "openly communicated" her ability to work seems to create a question of fact as to whether or not defendants actually relied on that note in not allowing her to return to work and, in combination with Long's statements previously referred to, fulfill her de minimis burden of establishing a prima facie case.

Turning to the second step in the *McDonnell Douglas* analysis, defendants have also provided two non-discriminatory reasons for their actions other than reliance on Dimino's note. First, defendants suggest that the reason for keeping Dimino off the job even after she made clear through counsel her desire to return to work without qualification was fear of liability both to Dimino and to third parties in light of her September 17 note. Second, defendants assert that SIRTOA policy requires that once an employee claims that he or she cannot perform his or her duties, that employee is sent to TMed for an evaluation and cannot return to the job until cleared for "Full Work" by the doctors there. *See* Joseph Dep. at 12–13; *id.* at 50–51; Long Decl. ¶ 4(b).

■ The first non-pretextual, non-discriminatory reason offered by defendants, relating to their concerns about tort liability, raises some novel issues. In addressing an employer's tort liability to mothers or would-be mothers the Supreme Court held that it was the mother who was to make the decision concerning any risks to the fetus, not the employer. *See Johnson Controls*, 499 U.S. at 209, 111 S.Ct. at 1209 (fear of tort liability does not justify fetal protection policy). In its discussion, the Court noted that Title VII may preempt negligence cases by pregnant or fertile women based on a premise that such women should not have been allowed to do a job. *See id.* The Court also implied that warning employees of relevant dangers, combined with appropriate control of the workplace environment, was an appropriate means of handling liability concerns. *See id.* at 211, 111 S.Ct. at 1210. Thus, fear of liability was not a valid justification for preventing Dimino from working. *See id.* at 209, 111 S.Ct. at 1209.

If defendants' concerns related to potential liability to Dimino or her fetus, defendants should have requested that Dimino sign a waiver, as suggested by *Johnson Controls*, and that she be fully evaluated—physically and psychologically—by their own personnel to determine whether, in light of her and her doctor's notes, she was able to do her job. In other words, the issue should have been addressed and dis-

---

4. Long has asserted that Dimino said she would not perform her duties. *See* Long Dep. at 40.

posed of head on. Instead, it appears that defendants attempted to circumnavigate the issue. In so doing, they succeeded only in creating a confusing chain of events which cannot be definitively said to rule out the possibility of unlawful discrimination, i.e., not allowing plaintiff to work due to the impermissible motivation of protecting the fetus or the pregnant mother.

The situation with respect to possible liability on SIRTOA's part to third parties presents different issues than refusing to allow plaintiff to work because of a concern for her fetus. In his concurring opinion in *Johnson Controls,* Justice White argued that while the majority had essentially held that mothers could waive their suits against an employer by continuing to work in the face of warnings, mothers could not, in fact, waive suits on behalf of their unborn children in most states. *See* 499 U.S. at 213, 111 S.Ct. at 1211 (White, J. concurring). By so noting, Justice White raised important concerns not addressed by the majority. While the *Johnson Controls* decision made it clear that concerns about the fetus were not for the employer but for the mother, the opinion did not have occasion to address the issue raised by this case—the employer's liability to third parties whose rights are clearly beyond the reach of Dimino's waiver.

■ It would appear that if defendants' concerns were based in substantial part on Dimino's note of September 17 and her original representations of liability exposure to third parties, acting on those concerns would not necessarily violate Title VII.[5] An employer is put at special risk by an employee who describes herself as dangerous regardless of the reason for the description. Putting on a lawyer's hat, one might imagine any number of occurrences involving Dimino in her role as police officer which could open SIRTOA up to claims for damages. For example, a SIRTOA commuter is injured by an assailant and the attack is witnessed by an on-duty Dimino, who fails to come to the commuter's aid. One can easily see a reasonably competent lawyer alleging that SIRTOA was liable because it had allowed an officer who had described herself as a danger to the public to remain on patrol. It would seem, therefore, that Dreyfus' demand that Dimino withdraw her request for restricted duty was a reasonable response to third party liability concerns.[6]

Although it is not obvious that the statement drafted by plaintiff's counsel or the lines Dimino crossed out on defendants' statement, including the language relating to the restricted duty request, impacted greatly on the issue of third party liability or made the two documents much different from defendants' original draft, their similarity is not enough to create a question of fact as to the motivations involved. Dreyfus' demand may have been unwise, but that would not be sufficient to create a jury question on the issue of pretext. Dreyfus' actions, however, are not the whole story. He was not the only decision maker. In this regard, it should be noted that although Long apparently had Dreyfus' phone number and was told to contact Dreyfus should plaintiff's counsel "make any further effort to negotiate the language of the settlement," Dreyfus Decl. ¶ 9, he never checked with Dreyfus on

---

5. A third possible motive for SIRTOA's actions, i.e., it determined that Dimino could not "do the job," is rejected by SIRTOA's actions. Although Long asserted during deposition that he was concerned that Dimino "would not get involved," Long Dep. at 132, Long's statements are inconsistent. More importantly, defendants were later willing to allow Dimino to return to work on her own say so. This implies that defendants were confident she could actually perform her duties.

6. Dreyfus' attempts to protect SIRTOA from such liability do not violate any clearly established right of Dimino's so as to provide grounds for personal liability on his part pursuant to 42 U.S.C. § 1983. *See Dimino v. Staten Island Railway/Staten Island Rapid Transit Authority et al.,* No. 97–CV–5927, 1998 WL 760341 (E.D.N.Y. Sept. 18, 1998).

September 27, to determine whether or not Dimino's amended statement was acceptable. Also, although Dreyfus apparently informed Long that the goal of the statement was protection from liability, Long asserted at his deposition that liability was not a consideration for him when he made his decision. *See id.;* Long Dep. at 130. In sum, Long's motivation remains an open question despite defendants' liability defense.

■ Defendants' second proffered justification for their continued refusal to allow Dimino to return to work in her normal capacity—that, having been sent to TMed, Dimino needed to be evaluated as qualified for "full work" by TMed—is also open to question.

The fact that SIRTOA offered to allow Dimino to return to work if she would sign the September 27 statement stating that she could do her full duties, was healthy, and withdrew her request for light duty, but not if she only indicated that she could do her full duties, raises a question of fact as to this justification. The agreement as originally written would not have been an evaluation for "full work" by TMed.[7] Conversely, since SIRTOA did not feel it needed a full medical evaluation, it could be argued that a medical evaluation was not as essential as claimed and that SIRTOA, and Long in particular, had concerns as to Dimino's pregnancy independent of her own evaluation. While the September 27 statement defendants wished Dimino to sign seems eminently reasonable, and the reasons for her refusal to sign less so, the fact that her refusal to sign the statement was the determinative factor in her not being allowed to return to work presents conflicting evidence as to defendants' rules and policies and undercuts their defense of a non-discriminatory reason for placing her on medical leave. This raises at least

a question whether the second justification is pretextual.

Accordingly, as thin as it is, Dimino has created an issue for a jury with regard to the propriety or impropriety of defendants' actions. Even if I am convinced, which I am, that Dimino was intent on immediately obtaining restricted duty, that SIRTOA was in an impossible situation in light of her notes, and that Dreyfus was genuinely concerned about SIRTOA's liability to third parties, SIRTOA's refusal to allow Dimino to work may well have been an unacceptable response to its fears of liability. More significantly, Long's concerns were admittedly not about liability. *See* Long Dep. at 130. It may well be that Long felt that, since Dimino had so explicitly expressed her concerns about her safety and that of the fetus, Dimino was no longer able to do the job required, i.e. her reaction to her pregnancy inspired Long's behavior, not her pregnancy alone. But Long did not explicitly say that. His ambiguous statements leave open the possibility that a jury could find his motive was an unlawful one.

Therefore, defendants' motion for summary judgment on Dimino's sex and pregnancy discrimination claims is denied insofar as the claims assert as a theory of recovery that Long and SIRTOA for impermissible reasons prevented Dimino from performing her full duties.

### (ii) The availability of restricted duty

Alternatively, Dimino argues that SIRTOA discriminated against her by not assigning her to restricted duty when such duty, despite SIRTOA's assertions to the contrary, is and has been available to other non-pregnant, medically limited, employees. This claim raises two issues for analysis to determine whether there is a prima facie case. First, was Dimino rejected for a position for which she was qualified?

---

7. Evidence that the September 27 statement was actually a settlement agreement in which SIRTOA waived its requirement of a medical exam in return for Dimino's signing of the statement would certainly undermine the above reasoning and lend credence to SIRTOA's contention that a neutral policy prevented Dimino from returning to work.

And second, were other "similarly situated" employees treated differently?

Defendants claim that, at least since 1995 when Long joined the sixteen member SIRTOA police department, SIRTOA has had a policy of not giving restricted duty assignments and, thus, there was no position for which Dimino was qualified. Dimino disputes this assertion. She contends (1) that SIRTOA has had an official policy which allowed restricted duty and never repealed that policy, and (2) that, even if SIRTOA's official policy forbids restricted duty, SIRTOA's actual policy is to make allowances for employees who cannot perform their full duties.

Dimino bases both statements on minutes from a 1992 union meeting and on the treatment of five other officers whom she claims were placed on light duty despite SIRTOA's assertion that there is no such assignment. The United Federation of Law Enforcement Officers' ("U.F.L.E.O.") Minutes of the Labor Management Meeting held on June 30, 1992, contain the following discussion item:

> ... E) Restricted Duty—The Authority states and has shown that it has assigned officers light duty non-patrol assignments in the past. *They will continue to attempt the same.* However, the assignments will not be in the police area due to the size of the department. Assignments will probably be in another title. The union will attempt to further clarify this issue at the next meeting. . . .

Pl.Ex. 14 (emphasis added). Dimino argues that, despite the ambiguous nature of the underlined language, this paragraph evidenced the presence of a policy involving restricted duty which was never "officially discontinued." Pl. Mem. at 19.

As examples that such a policy continued after 1992, Dimino relies primarily, but not exclusively, on SIRTOA's treatment of Police Officer Anthony Romeo. (Of the employees Dimino discusses, Romeo is the only one whose deposition was originally part of the record.) Romeo was employed by SIRTOA as a police officer. While in training at the New York City Police Academy, Romeo hurt his hamstring, an injury which temporarily prevented Romeo from participating in the calisthenics portion of his training. Dimino contends that both Long and Joseph knew of the injury and knew that Romeo was not able to perform everything required of him at the Academy, but, rather than sending Romeo to TMed, or requiring him to go on medical leave, SIRTOA (through Joseph and Long) allowed him to sit down during parts of his training and, thus, essentially placed him on restricted duty.

SIRTOA does not dispute Dimino's statement of these facts. SIRTOA argues, however, that because at the time he was injured Romeo was in training and, therefore, was not yet a patrolling police officer, he was not "similarly situated" to Dimino. Dimino attempts to undermine this argument by pointing out that there is only a single job description for a SIRTOA police officer, but the difference in situations seems so obvious that Dimino's attempt is unconvincing. This is especially true upon consideration of Romeo's deposition.

During the deposition, Romeo acknowledged that he was injured while jogging in the New York Police Academy gymnasium on September 14, 1998, at which time he went to "Cabrini" emergency room. *See* Romeo Dep. at 17, 26. On September 18, 1998, Romeo was married and then went on a one-week long honeymoon. *Id.* at 20–21. Although he saw another personal physician, he did not report to TMed until October 12, 1998. *Id.* at 18–19. While it is not clear exactly when Romeo was deemed able to fully participate in gym, the limitations of his participation are clear. In response to a letter from Romeo's personal physician to the effect that Romeo could participate in everything except the jogging, the Police Sergeant in charge of calisthenics at the Police Academy, Sergeant Halloran, told Romeo that if

he could not run, he could not participate in any of the other calisthenics. *Id.* at 32. Thus, in response to a letter from a personal physician and the orders of a New York City Police Sergeant, Romeo was put on somewhat restricted duty. Romeo was allowed to continue training in what the Academy called tactics—how to put handcuffs on a prisoner, disarm a suspect, etc. At the time, apparently, the subject was the placement of handcuffs which did not involve strenuous or violent physical endeavors.

Romeo testified that both Long and Joseph knew of the limitations on his training. *Id.* at 38, 46. Romeo further asserted that Joseph told him that if he could not keep up with the training or did not complete the qualifying runs (running a certain distance at a certain rate at a certain point in the training schedule) he would have to leave the academy. *Id.* at 39–40. This apparently never happened, because Romeo was able to meet his marks in training, despite his temporary lay off from calisthenics.

SIRTOA's treatment of Romeo does not seem to be comparable to the restricted duty sought by Dimino. As defendants point out, Romeo's job was to be trained. As long as he was able to fulfill the physical requirements when he went on active duty, it would seem that Romeo was completely trained. Had Romeo's injuries prevented him from participating in "tactics" training, which would presumably involve practicing skills, or any other type of training, the analogy to limited duty would be closer. However, as conditioning is directed toward the final goal of a certain physical condition, rather than a certain course of training, it cannot truly be said that calisthenics were duties which Romeo was not performing.

Dimino also asserts in her affidavit that, while Long was Chief, "P.O. Aubrey Grant was accommodated with a short assignment in a terminal token booth while he was recovering from foot surgery; and P.O. Billy Odum was accommodated with a

rescheduling of training because of a temporary partial hearing loss from scuba diving." Dimino Aff. ¶ 43.

Defendants presented evidence strongly disputing Dimino's representations. Long's Reply Declaration states that Grant was not put on restricted duty after his leg operation. *See* Long Reply Decl. ¶¶ 5(b), (c). Furthermore, an unsworn but signed memo from Grant stated that he was never placed on "limited duty." *See id.*, Ex. K. Finally, in his declaration, Long asserts that "by union agreement, the SIRTOA personnel assigned to work 'in a terminal token booth' are not SIRTOA police officers. So ... Officer Grant would not have been so assigned." *Id.* ¶ 5(e).

Similarly, Long explains in his declaration that Officer Odum was scheduled for a chemical hazard training course which involved listening to "material through earphones." *Id.* ¶ 6(b). Because of partial hearing loss due to scuba diving, Odum was allowed to reschedule the training. Long asserts, however, that Odum continued to go on regular patrol assignments and that the precise timing of when Odum took the course was unimportant to SIRTOA. *See id.* Furthermore, even if by some stretch these two events could be characterized as "restricted duty," they surely are not comparable to the long-term limited work that plaintiff's doctor's letter implied plaintiff required.

Dimino also makes references to Roy and Regina Dinkle, who, Dimino claims, were given restricted duty assignments in 1985 and 1990 by SIRTOA because of injuries that prevented them from going on patrol. *See* Dimino Aff. ¶ 36; Compl. ¶¶ 127(a), (b). Following oral argument, Dimino supplemented the record by submitting depositions of the Dinkles in support of her account. Defendants never contested that the Dinkles were given restricted duty assignments. Instead, defendants rely on the assertion that no light or restricted duty was available in late 1997,

or during Long's tenure as chief—which began in August of 1995. *See* Long Decl. ¶ 1. Defendants have further asserted that the fact that SIRTOA was moving offices and, thus, had administrative work that needed doing, and the fact that there were organizational differences between SIRTOA in 1990 and SIRTOA in 1997 make comparison between Dimino and the Dinkles useless.[8]

Finally, Dimino contends that Police Officers Colini and Schwartz were placed on restricted duty while awaiting their commissions "even though they could have been escorting SIRTOA employees to TMed drug tests, as Dimino could." Pl. Mem. at 18. This is presumably an argument that other police officers have had allowances made for them and, thus, Dimino should have had such allowances made for her as well. However the difference between restricted duty for a non-commissioned and, therefore, unauthorized, police officer and restricted duty granted for a medical problem is so great that it clearly overwhelms any argument that such a position existed for medically limited employees.

The sum of the various allegations discussed above is that, while SIRTOA may indeed at some point have had a policy of assigning employees to restricted or light duty when they had medical disabilities, there is little evidence that such a policy existed after 1995, when Long was hired, much less in 1997, when Dimino attempted to take advantage of it. To the contrary, defendants have presented uncontradicted deposition testimony from Long and Joseph asserting that no such duty exists. Consistent with this deposition testimony, defendants have also submitted a memo from SIRTOA, dated 1994, instructing the doctors at TMed that no restricted duty should be assigned because it does not exist. *See* Schoolman Decl., Ex. E. at 2. Furthermore, Dimino has been unable to demonstrate that any similarly situated employees were treated better than she was. Although Dimino asserts that P.O. Grant was briefly placed on restricted duty, while Long was Chief of the department, she has produced no other evidence to support her contention. An unsupported assertion of a single instance, denied by every other involved party, cannot create a genuine question of fact in the mind of a reasonable juror.[9] And, while it

8. In a letter dated August 13, 1999, defendants contend that it is relevant that at the time the Dinkles were given restricted duty, SIRTOA employees recovered for injuries under the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq.*, rather than Workman's Compensation. To have allowed Dinkle to work while subject to FELA would have substantially enhanced SIRTOA's exposure to damages if Dinkle had been hurt as a result of SIRTOA's or a co-workers negligence. Therefore, while there may have been a willingness to give "restricted duty" in 1985, that need did not exist in 1997.

9. Dimino appears to argue that the fact that she did not obtain an affidavit from P.O. Grant should not be held against her because "[t]he first amendment may not be so broad as to encompass police officers gratuitously volunteering to give statements to assist a co-worker who is suing the Police Chief." Letter from Plaintiff's Counsel to Court dated 5/27/99. In support of this contention she refers to *Hansen v. Soldenwagner,* 19 F.3d 573 (11th Cir.1994). There, a police officer, in the course of a deposition relating to the prosecution of another police officer for burglary, used foul language and made gratuitous criticisms of his superiors within the department. *See id.* at 574. In response, the city's chief of police ordered an Internal Affairs investigation which cumulated in the testifying officer's suspension. *See id.* The Eleventh Circuit held that the chief was entitled to qualified immunity from the officer's § 1983 suit because "in April 1990, [it] was [not] clearly established in this circuit that it was unconstitutional for police officials to investigate and to suspend an officer for making vulgar, insulting, and defiant criticisms of the department while giving testimony at a deposition pursuant to a subpoena." *Id.* at 575. It is difficult to see how these facts could be equated with an officer's willingness to admit that he was placed on restricted duty. Furthermore, Regina Dinkle, who is still employed by SIRTOA testified in deposition as to her experience with restricted duty without any problems. Therefore, there is little to suggest that Dimino could not have deposed Grant to support her contention.

is somewhat odd that SIRTOA has been unable to find an official statement changing a policy which apparently existed at some time in the recent past, that failure may be the result of the small size of the employee group involved, but in any case, it cannot be held to create a genuine question of material fact when defendants' evidence of the change in policy is essentially unrebutted.

Thus, no evidence supports Dimino's claim that she was denied a right granted to others, i.e., restricted duty. Therefore, summary judgment on Counts One, Eight, Nine, and Twelve is granted in favor of defendants insofar as she alleges that she was wrongfully denied an assignment of restricted duty.

### (2)

### Counts Three and Four—Disability Discrimination

■ In Counts Three and Four, Dimino alleges that defendants violated the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.* (Count Three) and the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, (Count Four) by perceiving Dimino as disabled, by discriminating against her on the basis of her perceived disability, despite the fact that she was qualified to do her job, and by failing to make reasonable allowances for her disability. Both the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA") establish that an otherwise qualified individual may not be discriminated against on the basis of a perceived handicap or disability. In order to establish a prima facie case under either of these statutes, a plaintiff must show that: (1) her employer is subject to the statute; (2) she suffers from a disability or handicap as defined by the relevant statute; (3) she can perform the essential functions of her job with or without reasonable accommodation (in other words that she is otherwise qualified for

the job); and (4) she was suspended because of her disability or handicap. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998); *Teahan v. Metro–North Commuter Railroad Co.*, 951 F.2d 511, 514 (2d Cir.1991). As in a Title VII case, once a plaintiff establishes a prima facie case under the statutes, the burden shifts to the defendant to show either that the plaintiff was suspended for a non-discriminatory reason or that the accommodations necessary for employee's employment would not have been reasonable. The parties here have not disputed that SIRTOA is subject to either statute. Nor do they dispute that plaintiff's pregnancy led, directly or indirectly, to her being placed on medical leave.

Because it is Dimino's contention that she was not disabled or handicapped at the time she was placed on medical leave, in order to sustain her two "disability claims" she must establish that she was perceived or regarded by her employer as disabled or handicapped under the statutes.[10] *See Colwell v. Suffolk County Police Dept.*, 158 F.3d 635 (2d Cir.1998). In other words, her employers must have had the impression that she was prevented from performing a major life function or activity such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i); *see Colwell*, 158 F.3d at 646. Dimino does not address this requirement at all. Instead, Dimino asserts that by placing her on medical leave around September 19, 1997, SIRTOA and Long indicated that they considered Dimino to be "too medically infirmed [sic] to work at all in any capacity." Pl. Mem. at 21. Despite having been placed on medical leave, there is no evidence that anyone thought that Dimino could not perform a major life activity. To the contrary, defendants' willingness to reinstate Dimino if

---

**10.** Dimino does not claim actual disability. Nor would such a claim be fruitful. Courts have consistently held that, while complications arising from a pregnancy may create a

disability, a normal pregnancy does not. *See Moawad v. Rx Place*, No. 95–CV–5243, 1999 WL 342759, at *6 n. 3 (E.D.N.Y. May 27, 1999) (and cases cited therein).

she withdrew her request for restricted duty indicates that they acknowledged that there was no fundamental activity Dimino could not perform.

Furthermore, defendants point out that any perception held by Long, SIRTOA, or TMed was created by Dimino through her statements, letters, and doctor's notes. Defendants contend that a perception of disability or handicap "shaped entirely by Officer Dimino and her doctor [ ] cannot [support] a perception-of-disability claim." Def. Mem. at 13. In support of this contention, defendants cite *Whitfield v. Pathmark Stores, Inc.*, 971 F.Supp. 851, 860–61 (D.Del.1997), *vacated in part*, 39 F.Supp.2d 434 (1999) (vacating previous decision insofar as it held plaintiff not actually disabled). There the district court addressed a situation in which an employee at Pathmark who had been in a car accident sustained back injuries which limited her abilities to move and lift but were, at first, thought to be temporary. The district court ruled that where a store which did not create special positions for employees with permanent disabilities treated an employee as permanently disabled after she produced a note from her doctor establishing the same, that store could not be found to have perceived the employee as disabled because she herself was responsible for the perception. *See id.* at 860. Thus, after having determined that the employee was not actually disabled as that term is defined by the EEOC, the court granted defendants summary judgment on the employee's ADA claim. *See id.* at 861.

In discussing the Rehabilitation Act, the Supreme Court has noted that Congress' extension of coverage to people "regarded as having an impairment, . . . reflected Congress' concern with protecting the handicapped against discrimination stemming not only from simple prejudice, but also from archaic attitudes and laws' and from the fact that the American people are simply unfamiliar with and insensitive to the difficulties confronting individuals with handicaps." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987) (internal quotations omitted). Similarly, "the purpose of the ADA is to dismantle employment barriers based on society's accumulated myths and fears." *See Sutton v. United Air Lines, Inc.,* —— U.S. ——, ——, 119 S.Ct. 2139, 2159, —— L.Ed.2d ——, —— (1999).

While an assumption that a pregnant woman could not work might be archaic and prejudicial, defendants' response to Dimino's representations that she would not be able to work are merely what one would expect from a concerned and careful employer. If Dimino created the impression she was unable to perform as a police officer, she cannot subsequently contend that she has recourse to statutes meant to protect those who are so considered against their own will and without evidence. Furthermore, while defendants' willingness to allow Dimino to work if she signed the September 27, 1997 statement counts against them with regard to Dimino's pregnancy discrimination claims, for these claims that willingness indicates that defendants felt that Dimino was in fact fully capable of work and did not perceive her as disabled.

In sum, because Dimino has presented no evidence that she was perceived as disabled as defined by the relevant statutes, her disability claims, Counts Three and Four, are dismissed.

(3)

**Count Two—Retaliation Under the Civil Rights Act**

Dimino next alleges, in Count Two, that defendants violated § 704(a) of the Civil Rights Act of 1964 by discriminating against her because she opposed an employment practice made unlawful under Title VII. *See* Compl. ¶ 83. Although Dimino does not clarify the factual basis of this claim in her complaint, it appears from her briefs that she is asserting that the September 27, 1997 statement situation was a

retaliation for her having filed an EEOC complaint on September 22, 1997.[11] *See* Pl. Mem. at 23.

A plaintiff employee establishes a prima facie claim of retaliation by demonstrating that: (1) he or she "was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon [his or her] activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993). An adverse employment action may consist of discharge, reduced wages or benefits or even "less flagrant reprisals," which make a job undesirable. *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). Furthermore, depriving a plaintiff "of the ability to 'expeditiously ascertain and enforce her rights' " may meet this standard. *See Penny v. Winthrop–Univ. Hosp.,* 883 F.Supp. 839, 845 (E.D.N.Y.1995) (quoting *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991)).

The filing of an EEOC complaint is a protected activity. *See Cosgrove,* 9 F.3d at 1039. Dimino has submitted a letter from her counsel to Chief Long, dated September 24, 1997, informing him of the EEOC complaint filed two days earlier. *See* Pl.Ex. 10. Furthermore, while the close temporal connection between the filing of the complaint and the allegedly adverse action may be taken to satisfy the causation requirement, *see Cosgrove,* 9 F.3d at 1039–40, here, defendants dispute whether there was, in fact, any adverse action related to the EEOC complaint.

If SIRTOA refused to allow Dimino to return to work because she had filed an EEOC complaint that would establish a case of retaliation.[12] However, SIRTOA was apparently willing to allow Dimino to return if she signed a statement attesting to her physical capabilities and retracting her request for restricted duty. The language of the statement did not on its face require that Dimino withdraw her EEOC complaint, which might also have been an adverse action. Dimino contends, however, that withdrawing her request would have "mooted" her EEOC complaint and,

11. Dimino also contends at one point that SIRTOA retaliated against her by not assigning her to the restricted duty recommended by the TMed doctors, who do not appear to have been aware of SIRTOA's policy. Since no restricted duty was available, this could not constitute retaliation.

12. Defendants contend that, because Dimino had already stopped working at the time the EEOC complaint was filed, the opportunity to return to work was the beneficial result of settlement negotiations. Therefore, according to defendants, the withdrawal of that opportunity was not an adverse employment action, but rather, was either a failure of negotiations or the recission of an offered benefit.

In *Penny v. Winthrop–Univ.,* 883 F.Supp. 839 (E.D.N.Y.1995) the district court addressed a similar, but not identical, situation. There, a nurse had filed a grievance against a hospital based on her having been terminated by that hospital. At the final stage of the grievance procedure, after the discharge had been upheld throughout the prior three stages, the hospital's president wrote the nurse a letter in which he offered to reinstate her in return for, *inter alia,* her dropping the charges of discrimination alleged in her grievance complaint. The court ruled that the president's act was not retaliatory: "if anything, the [ ] letter constitutes the opposite of an adverse action, because it conditionally offers the plaintiff reinstatement of her already terminated position." *Id.* at 845.

Defendants' attempt to characterize this case in the same light is unconvincing. There is no question that Dimino had not lost her job; defendants' own theory posits that she was merely placed on medical leave because SIRTOA was unable to establish that she was fit for "full work." Furthermore, defendants specifically assert in relation to a separate claim that Dimino was not the subject of any disciplinary action. Thus, *Penny* is not on point because the offer in the September 27th statement did not give Dimino anything which had been taken away; it merely changed her work status.

thus, defendants' condition was tantamount to a requirement that she withdraw her EEOC complaint. While, apparently, the EEOC may dismiss complaints for mootness, see, e.g., *Pendas v. Runyon*, 933 F.Supp. 187, 191 (N.D.N.Y.1996) (postal employee who brought EEOC claim had claim dismissed by ALJ on grounds of mootness because employee had retired), it is not clear that such action is required. Moreover, as already discussed with regard to the September 27 statement, there is no evidence that defendants intended that Dimino waive or withdraw her complaint. To the contrary, Dreyfus repeatedly asserted that the statement was intended to preserve Dimino's rights, and, indeed, the language of the statement indicates no waiver of rights. Furthermore, plaintiff and plaintiff's counsel were concerned with the language of the statement not because of its effect on her EEOC claim of discrimination,[13] but rather because of its seeming effect on Dimino's right to request restricted duty. See Dimino Dep. at 63. Therefore, because a reasonable juror could not conclude that Dimino's EEOC complaint resulted in any adverse action on SIRTOA's part, defendant's motion for summary judgment on this count is granted.

### (4)

### Count Six—First Amendment Retaliation

Dimino also alleges, in Count Six, that defendants retaliated against her for requesting restricted duty as a pregnant police officer in violation of her First Amendment right to free speech and to petition the government. See Compl. ¶¶ 99 et seq. She brings this claim pursuant to 42 U.S.C. § 1983. Claims brought under the Right to Petition Clause or the Free Speech Clause of the First Amendment are governed by the same interest balancing test. See *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.1993). Under either clause, in order to bring a successful cause of action, a plaintiff must establish that: (1) he or she spoke out on matter of public concern, and (2) he or she was retaliated against because of that speech. See *id.* at 1058. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

Here both the form and the content of Dimino's complaints may indicate that she was raising a matter of public concern. Dimino's complaint to the EEOC was, arguably, the first step in challenging what she felt was a broad based discriminatory policy. No one could argue that the content of a claim of discrimination on the basis of pregnancy is not an issue of public concern. Indeed, in *Lehmuller v. Incorporated Village of Sag Harbor*, 982 F.Supp. 132, 138 (E.D.N.Y.1997), it was held that a police officer's EEOC complaint in which an officer alleged that her police department had discriminated against her by not allowing pregnant women to serve restricted duty assignments could be a matter of public concern.[14]

13. It should be noted that Dimino's EEOC complaint alleged that defendants were discriminating against her by refusing to assign her to restricted duty when they had assigned other officers to such duty. If Dimino had provided evidence that restricted duty assignments were available in 1997, it might be plausible to argue that by requiring Dimino to withdraw her request for such an assignment, defendants were retaliating against her for her accusations. However, because Dimino has not provided any evidence that such an assignment was available, defendants' insistence that she withdraw her request cannot be considered to have been retaliatory.

14. It should be noted that the district court in *Lehmuller* specifically stated that the background in that case was especially convincing. The plaintiff in that case "was the first female police officer ever hired by the Village and it was the first time that the Village had ever confronted a request like the plaintiff's to be placed on 'light duty' status due to her pregnancy." *Lehmuller*, 982 F.Supp. at 138. Dimino alleges that she was the first female

The context of Dimino's claim, however, is less clear. Defendants contend that, unlike *Lehmuller*, where the police department already had in place a limited policy of restricted assignments for officers injured in the line of duty, SIRTOA had no light duty policy at all. Defendants further contend that the form of Dimino's complaint—a filing with the EEOC—was not an attempt to right an injustice to women, but was, instead, an attempt to garner a benefit unavailable to all other employees—restricted duty. Furthermore, as the district court noted in *Lehmuller*, because the EEOC complaint was brought in the context of a private dispute the public nature of the speech is weakened. Nevertheless, despite the fact that Dimino's EEOC complaint seemed primarily addressed at her private problems with SIRTOA, it would seem that a complaint touching on the rights of pregnant women to be treated equally must be a matter of public concern.

As was the case for her Title VII retaliation claim, however, and for the same reasons, Dimino is unable to satisfy the causation prong of the test. Therefore, defendants' motion for summary judgment on Count Six, Dimino's First Amendment claim, is granted.

### (5)

### Count Five—Disparate Impact Under Title VII

Dimino also asserts that SIRTOA's job descriptions, assignment policies, and alleged policy of not assigning police officers to restricted duty have a disparate negative impact on pregnant women and, thus, violate Title VII and the Pregnancy Discrimination Act (Count Five). While plaintiffs seeking remedy pursuant to Title VII may generally rely on either proof of disparate impact or disparate treatment, *see Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 986–87, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988), disparate impact analysis in the present case raises a troubling issue.

Disparate impact analysis affords a Title VII plaintiff relief on the basis of the discriminatory effect of a policy which is facially neutral without regard to whether or not there was any actual discriminatory intent on the part of the creators of the policy. *See id.* In general, such a claim requires substantial statistical support. *See id.* at 994–95, 108 S.Ct. at 2788. Furthermore, the Supreme Court has noted that a small statistical sample or incomplete data sets would be standard weaknesses in the support of such a claim. *See id.* at 996–97, 108 S.Ct. at 2790. Before even evaluating the quality of the evidence Dimino has submitted, however, it is important to note that disparate impact analysis may be particularly inappropriate in the case at hand.

It has been repeatedly affirmed that the PDA does not require the creation of special programs for pregnant women; nor does it mandate any special treatment. *See, e.g., Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.1998); *Lang v. Star Herald,* 107 F.3d 1308, 1313 (8th Cir.1997); *Piraino v. International Orientation Resources, Inc.,* 84 F.3d 270, 274 (7th Cir.1996). To the contrary, the statute specifically requires that pregnant women be treated the same as all other employees with similar disabilities. *See* 42 U.S.C. § 2000e(k). Here, Dimino's disparate impact claim is based on the premise that the facially neutral policy of not providing restricted duty to any medically limited police officer has a disparate impact on pregnant women.[15] The only remedy

---

officer to make such a request "in writing." Compl. ¶ 104. This codicil may be a reference to Regina Dinkle who allegedly was placed on medical leave because of her pregnancy.

**15.** Dimino's additional assertions that the job descriptions or placement policies have disparate impact are not supported by evidence at all. Furthermore, there is no evidence that a pregnant woman has ever been placed on medical leave because she was unable to meet

for such a problem would be either the creation of a restricted duty assignment for all employees or for pregnant women. Both solutions would seem to violate the underlying assumption of equality over favoritism or allowance. While disparate impact analysis might be appropriate for a more narrowly tailored policy—for instance, one that penalized internal illness more than external injury—here the broad policy of not allowing medically based restricted duty does not invite disparate impact analysis.

Even when that issue is disregarded, however, Dimino's evidence of disparate impact is too weak to support a Title VII claim. The only statistical evidence Dimino has submitted is the claim that because both she and Regina Dinkle were required to take medical leave when pregnant, SIRTOA's policy has created "100% gender discrimination by disparate impact." Pl. Mem. at 26.[16] In order to establish that claim, Dimino would have had to submit evidence indicating that women lose more work time than men do because of the policy of no restricted duty. Considering Dimino's contention that restricted duty is not medically necessary until the final months of pregnancy, it is not obvious that, over the long term, women will suffer from the "no restricted duty" policy more than men will.[17] Furthermore, Regina Dinkle's deposition indicates that she chose to leave work when pregnant, rather than that SIRTOA forced her to leave.

Accordingly, no reasonable juror could conclude, on the evidence provided, that SIRTOA's policies have a disparate impact. Thus, Count Five, the disparate impact claim, is dismissed.

specific job requirements, as opposed to because of defendants' general concerns regarding pregnancy and its impact on a police officer's ability to perform her duties.

16. In the following paragraphs of her memo, Dimino returns to the theme that male officers, like P.O. Romano, have been given restricted duty when injured. See Pl. Mem. at

## (6)

## Count Seven—Violations of Due Process

In Count Seven of her complaint, Dimino asserts a claim, pursuant to 42 U.S.C. § 1983, alleging that she was deprived of liberty and property interests without due process in violation of her rights under the Fifth and Fourteenth Amendments. Dimino contends that by suspending her without a hearing and depriving her of her paycheck, defendants deprived her of property. She further contends that by taking her guns from her when she was placed on medical leave, she suffered an injury to her reputation and, thus, a deprivation of her liberty interest.

 The Constitution protects, but does not create, property interests. See *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 628 (2d Cir.1996). It is well recognized that public employees who are subject to dismissal only for cause, as is Dimino, have a property interest in their employment and may not be discharged without due process. See *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548 (1972). Moreover, the Supreme Court recently extended the protections of due process, in a more limited form, to suspensions of such employees as well. See *Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). In doing so, however, the Court recognized that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 930, 117 S.Ct. at 1812 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). The three factors identified by the Court as determinative are: (1) the private interest affected; (2)

25–26. This allegation relates to a disparate treatment theory of recovery, not a disparate impact theory.

17. It appears from the materials that there is some sort of maternity leave available. See Joseph Decl. ¶ 3.

the risk of erroneous deprivation of the interest through use of procedures in place and the value of additional safeguards; and (3) the government's interest. *See id.* at 931–32, 117 S.Ct. at 1812.

In placing Dimino on medical leave, defendants did not discharge Dimino, nor even suspend her. However, defendants did deprive her of her job (temporarily) and of her paycheck (again temporarily). In her complaint, Dimino alleges that her benefits may have been affected, *see* Compl. ¶ 117, but she has not provided evidence that this has occurred. Thus, while Dimino did suffer a loss of property, that loss seems to have been relatively minor and correctable at a later point. Furthermore, the procedural safeguards that were in place, and the government's overwhelming interest more than satisfy the limited due process protections implicated.

■ Although Dimino never went through the formal grievance procedures apparently set up under her union's agreement with SIRTOA, *see* Def. Mem. at 22, she did, by being sent to TMed, go through a pre-deprivation process aimed at objectively verifying whether or not she was fit for work. Whether or not the process was, in fact, objective, is an issue addressed in the other claims. Furthermore, while no formal hearing was ever conducted, it is clear that defendants repeatedly allowed Dimino to present evidence that she was fully medically qualified for work. Thus, it is difficult to conclude that Dimino did not receive due process before being placed on medical leave or that a different type of process would provide greater protection.

■ ▪ Most importantly, the government has an overwhelming interest in being able to place Dimino on medical leave without a hearing. If a police department could not temporarily place officers who seemed unfit for duty—much less one who herself represented that she was unfit for duty and might create a danger to her fellow officers and the public—on medical leave without a prior hearing, police departments would be unacceptably hobbled.

■ Dimino additionally claims that she never received a post-deprivation hearing. However, Dimino could have, upon a proper showing from her doctor, received a "Full Work" evaluation from TMed at any time and returned to work. Thus, a post-deprivation procedure was in place. As was the case for many of her other claims, the fact that defendants would have allowed Dimino to return to work had she withdrawn her request for light duty raises a serious question as to whether or not the process for medical evaluation that defendants allege existed was actually the mechanism which denied her a return to full work. However, to the extent that she was kept from working because of other improper motives of the defendants, her other claims provide her a remedy.

■ Dimino's deprivation of liberty interest claim is entirely without merit. When the state discharges an individual, refuses to rehire that individual, and makes a public announcement that might "effectively put a significant roadblock in that employee's continued ability to practice [ ] her profession," the employee may have a due process claim for deprivation of her liberty interest. *Donato,* 96 F.3d at 630. More broadly, defamation may violate a plaintiff's liberty interest if it is accompanied by the "dismissal from a government job or deprivation of some other legal right or status." *See Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). Significantly, the Second Circuit has noted that where a "defamation" occurred after termination and did not preclude a defendant from working somewhere else, it did not "trigger due process rights." *Id.* (discussing *Gentile v. Wallen,* 562 F.2d 193 (2d Cir.1977)).

■ Dimino alleges that she was defamed when Long "took away her guns from her after learning she was pregnant." Pl. Mem. at 27. Dimino has not alleged,

nor presented evidence, that this action was publicized. Nor has she asserted of what right she was deprived. Dimino was not actually fired; she was not deprived of the right to carry weapons; nor is there any evidence that Long's actions would have prevented her from obtaining a job elsewhere. In short, while Dimino alleges that, in the parlance of the liberty interest, she suffered "stigmatization plus," there is no evidence of the stigma, nor the plus. Finally, the process arguments made above would be equally applicable to this claim.

■ Defendants additionally, and convincingly, contend that grievance procedures available under the collective bargaining agreement provided a post-deprivation "due process" of which Dimino never availed herself. Indeed, other courts have held that "dispute resolution created by a collective bargaining agreement can satisfy due process requirements." *DeClara v. Metropolitan Transp. Auth.*, 748 F.Supp. 92, 96 (S.D.N.Y.1990) (quoting *Parrett v. City of Connersville*, 737 F.2d 690, 696 (7th Cir.1984)). Dimino does not dispute that such procedures were available; nor does she assert that they were inadequate. Instead, Dimino contends that "because the union agreement 1) does not pertain to pregnancy matters insofar as the issues addressed herein; and 2) was not negotiated with ... [pregnant women] in mind," she was not obligated to limit her claims to those procedures. Pl. Mem. at 27 n. 14. In support of this contention, Dimino cites this court's decision in *Fox v. Northwest Airlines*, No. 96–CV–0940, 1998 WL 178874, at *4–5 (E.D.N.Y. Feb.26, 1998)

(Trager, J.). There, in addressing a Title VII complaint brought by a flight attendant who claimed that she had been wrongfully fired because she was a woman, it was recognized that, pursuant to the Supreme Court's holding in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 49, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the fact that plaintiff had pursued her grievance to final arbitration did not preclude her from bringing a private cause of action. This ruling in no way suggests that grievance procedures do not provide due process. While Dimino may not have been obligated to limit her action to the procedures available, having chosen to ignore them, she cannot then rely on her choice to allege a lack of due process.[18] Accordingly, defendants' motion for summary judgment on Count Seven, Dimino's due process claim, is granted.

### (7)

### Rule 408

This is one of those rare cases where a ruling on an evidentiary issue might be determinative either of the motion for summary judgment or, if the record remains essentially unchanged, for judgment as a matter of law at trial. Defendants have contended that the events surrounding the September 27 statement, as well as the statement itself, should be excluded from evidence pursuant to Rule 408 of the Federal Rules of Evidence. As is obvious from the preceding discussion, such an exclusion might have a significant effect on plaintiff's sex and pregnancy discrimination claims because, without that evidence, plaintiff has almost nothing with which to

**18.** Dimino appears to allege an additional ground for her due process complaint in her Memorandum in Opposition to the Motion. There, Dimino claims that "TA and SIRTOA did not follow their own procedures [which] led to a wrongful deprivation of [a] property right." Pl. Mem. at 27. Dimino does not specifically allege which procedures were not followed, nor how the failure to follow procedures resulted in a deprivation. Further-

more, the case she cites for support, *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), dealt not with a due process claim, but with "the legality of [the] discharge [of] an employee of the Department of the Interior" when the manner of the discharge was not in keeping with the department's regulations, or the statutory mandates concerning sensitive positions. *Id.* at 536, 79 S.Ct. at 971. Thus, *it is entirely irrelevant.*

contradict defendants' non-discriminatory justifications, although Long's ambiguous statements remain.

Rule 408 of the Federal Rules of Evidence states as follows:

### Rule 408. Compromise and Offers to Compromise

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The primary purpose of this rule is to further the policy of promoting settlements and honesty in settlement negotiations. *See* Fed.R.Evid. 408 advisory committee's notes. If an offer to settle a dispute could be used as evidence of the weakness of the offeror's claim or defense, parties would seldom come to the negotiating table. Therefore, the rule provides wide protection to both the fact of the settlement or offer to settle and to negotiations and conduct associated with settlement or offer to settle. The rule also protects admissions of facts made by parties during settlement negotiations, in order to allow parties a greater degree of honesty and, therefore, a greater ability to reach a compromise. A secondary purpose of the rule is to acknowledge that statements made during settlement negotiations, as well as the fact that settlement

was proposed or consummated, may be prejudicial towards the settler while holding little probative value. *See id.* In this role, the rule is one governing relevance. The rule's protective umbrella is not, however, absolute. Evidence relating to settlement negotiations may be admissible if the party's intention is not that the evidence be probative of the validity or amount of the disputed claim at issue in the negotiations. *See* Fed.R.Evid. 408.

Whether or not the rule bars the admission of the facts surrounding the September 27 statement, or the statement itself, is a close question. What makes the issue difficult is that, unlike the usual case where the alleged discriminatory events occur before litigation arises, here, the key events unfolded simultaneously with the prospect of litigation. Thus, it is difficult to distinguish between the events themselves and discussions relating to, or attempting to resolve, the issues raised by the purported discriminatory actions.

The first issue in Rule 408 exclusion is whether or not there was a dispute at the time that the purported settlement offer or negotiations took place. In *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2d Cir.1992), the Court of Appeals for the Second Circuit wrote:

> It is often difficult to determine whether an offer is made "in compromising or attempting to compromise a claim" ... However, where a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408. The party seeking admission of an offer under those circumstances must demonstrate convincingly that the offer was not an attempt to compromise the claim.

*Id.* at 827 (citations omitted). In this case, it cannot be questioned that a dispute existed. Dimino had filed an EEOC complaint. The September 27 letter came about through discussions between counsel

for Dimino and SIRTOA, and counsel for Dimino effectively threatened legal action in her September 24 letter to Long.

The second issue is whether SIRTOA proposed to furnish a valuable consideration; in other words, was there an "offer"? *See* Weinstein's Federal Evidence § 408.03[3]. The term "valuable consideration" should be interpreted broadly. *See id.* An apology has been accepted as valuable consideration. *See id.* SIRTOA presumably would claim that allowing Dimino to return to work was a valuable consideration.[19] While offering an employee his or her job back is certainly valuable consideration, in this case Dimino had never lost her job. According to SIRTOA, Dimino could not work because she had been sent to TMed and TMed had not evaluated her as qualified for full work. Therefore, the valuable consideration ostensibly offered to Dimino could only be SIRTOA's waiver of its policy requiring TMed to evaluate a possibly infirm employee as qualified for full work before allowing an employee to return to work following a visit to the TMed clinic.

There has been no evidence, however, that this is the consideration SIRTOA intended to offer. While Dreyfus attests that he made the offer available to Dimino "after speaking with high-level SIRTOA personnel," Dreyfus Decl. ¶ 4, he does not describe who those personnel were, what positions they held, or what consideration they authorized Dreyfus to offer. To the contrary, it is not clear that Dreyfus offered Dimino anything to which she did not already have a right under SIRTOA's policies.

The clearest expression of the problem facing Dimino, as Dreyfus saw it, and, thus, the best evidence of what it was Dreyfus was offering, is found in the message he left on the answering machine for Dimino's counsel, the evening of September 26, 1997, after he and plaintiff's counsel had exchanged drafts of the statement.

This is Richard Dreyfus of the Transit Authority [ ]. I am faxing you a response to your memo. I don't find it appropriate. I would like her to sign the memo which I have drafted. I think it protects her in all respects. That memo has been given to her department. If she will sign it she can come to work tomorrow. If she is not going to sign it then she is not going to be allowed to work *since she hasn't withdrawn her request that she is medically incapable of performing her duties and wants restricted duty.* . . .

Dreyfus Decl. ¶ 7 (emphasis added).

This message seems to assert that the reason Dimino could not work was that she had requested light duty and asserted that she was medically incapable of performing her duties. If that were the case, allowing her to work in return for a withdrawal of her request and a retraction of her statement of possible medical infirmities would not be an offer of a valuable consideration. Instead, it would merely be an expression of a purported SIRTOA policy.

■■■ Dreyfus' statements also raise the question whether Dimino was compromising any of her claims against SIRTOA in exchange for their valuable consideration. At the time, September 27, 1997, Dimino had filed an EEOC complaint alleging she was the victim of discrimination based on both her sex and her perceived disability. Neither of these claims were waived by the September 27 statement as written by Dreyfus. To the contrary, Dreyfus notes that plaintiff's counsel did not want to "prejudice a later EEOC complaint from Ms. Dimino," Dreyfus Decl. ¶ 6, but asserts that he felt his proposed language protected Dimino "in all respects." *Id.* ¶ 7. Dimino had also threatened litigation with regard to regaining her full work status. This claim would have been largely mooted

---

**19.** While defendants have not directly asserted that allowing plaintiff to return to work was a benefit, they have implicitly so stated by repeatedly contending that not allowing plaintiff to return to work was not an adverse employment action.

by a return to full work, but not waived since some loss of pay would have still been at issue. Finally, Dreyfus specifically acknowledges that the statement was not intended to settle issues concerning back pay. *See id.* ¶ 4. Thus, both on its face and as described by Dreyfus, the statement did not require that Dimino release any claims against SIRTOA at all. In fact, the only liability concerns Dreyfus raised while discussing the statement related to liability to third parties. Thus, despite the fact that, in his declaration to the court, Dreyfus continually refers to his discussions with plaintiff's counsel as an attempt to "settle" or to "negotiate," evidence that a settlement was actually proposed or terms negotiated is equivocal. It is not at all clear that SIRTOA offered to trade any valuable consideration for any compromise of a claim. Accordingly, evidence of the discussions would not seem to fall under the scope of Rule 408's exclusion.

██ More relevant, perhaps, than this parsing of evidence is the use to which the September 27 statement would be put both in this motion and at trial. Rule 408 prohibits the use of evidence relating to settlement negotiations to "prove liability" of the claim which was attempting to be settled. Fed. R. Evid. 408. If such "evidence is offered for another purpose," however, the rule "does not require exclusion." *Id.* Here, plaintiff has alleged two retaliation claims primarily based on the events surrounding the statement and discrimination claims impacted by the same events. Settlement negotiations involving the statement could not have been related to settlement of the retaliation claims. Therefore, Rule 408 does not exclude the use of evidence of the events surrounding the statement from consideration with regard to the retaliation claims.

██ The evidence would also be admissible for certain purposes with regard to the discrimination claims even if it were found to be related to negotiations to settle the discrimination claims. Courts have held that evidence otherwise excludable pursuant to Rule 408 is admissible for the purposes of impeachment. *See, e.g., Cochenour v. Cameron Savings and Loan,* 160 F.3d 1187, 1190 (8th Cir.1998) (an offer to compromise may be used to rebut a party's prior testimony); *Reichenbach v. Smith,* 528 F.2d 1072, 1075 (5th Cir.1976) ("Rule 408 codifies a trend in case law that permits cross-examination concerning a settlement for the purpose of impeachment."); *Tribune Co. v. Purcigliotti,* 1996 WL 337277 (S.D.N.Y. June 19, 1996) (settlement discussions may be used for impeachment). As is set out in the substantive discussion of the claims, and as is conceded by defendant, the value of the statement and the events surrounding it to plaintiff's discrimination claim is solely its use in suggesting that SIRTOA's non-discriminatory justifications for not allowing Dimino to return to work once she had established that she was at that time capable of so returning are pretextual. *See* Def. Letter dated 7/28/99, at 5. It does not seem unreasonable to hold that proving pretext is closer to impeachment than it is to proof of liability.[20]

In anticipatory rebuttal of this conclusion, defendants' letter on the issue cites *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474 (7th Cir. 1990) (herein *"Burnham"*), for the proposition that, pursuant to Rule 408, evidence of settlement negotiations may not be used to prove pretext. In *Burnham,* however,

---

**20.** The comprehensiveness of the dispute addressed during the negotiations may also be a determinative factor with respect to the admissibility of the evidence with regard to these claims. For instance, it is undisputed that the negotiations did not relate to Dimino's back-pay claim. Courts have held that where settlement negotiations were not intended to address certain claims, they may be admitted as evidence in the litigation of those other claims. *See, e.g., Thomas v. Resort Health Related Facility,* 539 F.Supp. 630, 638 (E.D.N.Y.1982) (where settlement is related to dispute over employment and not to dispute over back-pay, offer of employment is not excluded on back-pay issue).

the Seventh Circuit's opinion was limited to the holding that the district court had not abused its discretion by excluding the evidence. Furthermore, although the text of the settlement in question is not discussed in the *Burnham* opinion, the Seventh Circuit wrote that it "would have been used by the plaintiff to show that the demands of the defendants were a pretext *for racial animus.*" *Id.* at 1482 (emphasis added). Here, there is no relationship between the evidence of settlement and discriminatory intent. Instead, the evidence is probative only on the issue of pretext, i.e., it relates to the truth of defendants' purported nondiscriminatory justifications for not allowing Dimino to work. Use of the evidence for such a purpose would not allow a reasonable juror to infer discriminatory intent—the true issue in contention. Therefore, *Burnham* is not squarely on point, and the evidence will not be excluded from consideration at this stage of the proceedings.

It should be emphasized that the use of this evidence in this case will not offend the policy goals of Rule 408. If defendants had made a stronger case as to the substance of the settlement agreement, that agreement would have been more likely to gain protection under Rule 408.[21] On the same note, this evidence should not have the effect at trial of implying to the jury that defendants attempted to settle a claim and, thus, were guilty of discrimination. If the letter were a settlement in that SIRTOA was willing to waive its policy of requiring a medical evaluation, the existence of the policy will fatally undermine plaintiff's claims of discrimination. If the letter were a statement of SIRTOA's policy, then it was not an attempt to settle and carries no stigmata of guilt or vulnerability to suit. It may, however, contradict other statements made by defendants that they were unable to reassign Dimino to duty because she had not been evaluated as healthy by TMed.

Finally, there is no danger that allowing such evidence will undermine the ability of employers and employees to negotiate an employee's return to work when that employee is unjustifiably laid off or refused a promotion. In such a case, an offer of a job or a promotion by the employer following an employee's threat of litigation could imply to jurors that there was something discriminatory about the original job action. Here, no such implication is possible because the evidence relates to a purported policy, not to the defendants' interactions with this particular plaintiff. In this case, the evidence may be used simply to prevent defendants from misrepresenting facts in court when they have previously represented otherwise.

(8)

## Long and the Transit Authority

Defendants contend that regardless of whether or not SIRTOA is subject to liability under any of the above claims, neither the claims against John Long nor against the Transit Authority should be allowed to stand.

Dimino asserts claims against Long pursuant to 42 U.S.C. § 1983 only. Defendants contend that Long is entitled to qualified immunity from suit under this statute because Dimino has not asserted that Long violated any of Dimino's established constitutional rights.[22]

The § 1983 claims alleged by Dimino include: Count Six (her First Amendment retaliation claim); Count Seven (her deprivation of property and liberty interests without due process claim); and Count

---

**21.** Of course, defendant is not precluded from making such a showing at trial and having this issue revisited.

**22.** Insofar as the § 1983 claims are brought against SIRTOA they may or may not be vulnerable to defenses that there was no policy or practice supporting Long's actions. *See Monell v. Department of Soc. Svcs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because SIRTOA has not raised such a defense at this time, it need not be addressed here, but may still become relevant at trial.

Eight (her equal protection claim). As Counts Six and Seven have been dismissed, only Count Eight remains relevant.

Count Eight, Dimino's equal protection claim, is largely based on evidence of Long's actions. Defendants contend that Long should not have known either that Dimino was entitled to restricted duty (which she wasn't) or that placing an employee on medical leave when asked for restricted duty was a violation of a clearly established constitutional right (which also was not the case). Therefore, defendants maintain, Long is entitled to qualified immunity, and the equal protection claim against him should be dismissed.

■ However, these arguments do not address the relevant issues. Dimino contends that, though in her original conversation with Long "she openly communicated her belief she could still do her job in a safe manner," Dimino Aff. ¶ 10, Long did not relay that fact to Joseph during the phone conversation between Long and Joseph which immediately followed. *See id.* ¶ 11. This failure, if it indeed occurred, may have been the immediate cause of her being sent to TMed and, according to SIRTOA, being placed on medical leave because she could not receive an evaluation from TMed of qualified for "Full Work." Dimino also contends that Long attempted to exacerbate this problem by not producing an accurate list of work requirements from which Dr. Arbucci would have been able to make a more definite assessment of her ability to work. Furthermore, Dimino contends that Long in particular had a prejudice against pregnant women working for the police. In support of this contention Dimino relies on comments Long made during his deposition that he was concerned that she not injure her fetus by acting as a police officer. *See* Long Dep. at 107, 132. If such a concern motivated Long to keep Dimino on medical leave that fact would seem to create a case for violation of the equal protection clause. Finally, as noted above, defendants' contention that Long refused to allow Dimino to work only because she did not have a "Full Work" evaluation from TMed has been undermined by the fact that he would have allowed her to work had she attested to her physical capabilities and withdrawn her request for light duty. Accordingly, Long is not entitled to qualified immunity from Dimino's equal protection claim and defendants' motion for summary judgment on that claim with regard to Long is denied.

Defendants also argue that Dimino's claims against the Transit Authority should be dismissed because she has neither alleged nor demonstrated a policy or practice which would support liability under 42 U.S.C. § 1983. *See Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Although the defendants moved pursuant to Fed.R.Civ.P. 12(b)(6), they have treated the issue as though it were a summary judgment motion. Dimino's response to the defendants' contention is twofold. First, Dimino asserts that the "transit authority is responsible for what its doctors did nor [sic] didn't do, so long as it was in the scope of the TA's authorized work." Pl. Mem. at 28. This is clearly not the case. Second, Dimino argues in her memo that the doctors were implementing a fetal protection policy by not clearing her for full work or evaluating her with the same thoroughness that they evaluated Officer Romeo when he was injured. However, unlike the situation involving SIRTOA, there is no evidence that the TMed doctors did anything except rely on Dimino's private physician. Whether right or wrong in their reliance, Dimino has produced no evidence to suggest that the doctors were, actually, motivated by an animus towards pregnant women in the workplace.

Finally, Dimino contends that the TA should be held liable for creating an additional administrative requirement, the withdrawal of her request for restricted duty, before qualifying her as ready for full work. Pl. Mem. at 11. This is a theory of responsibility based on actions

**166**

by Dreyfus, legal counsel for the TA and SIRTOA on this matter. Dreyfus has made it clear that his actions were based on conversations with SIRTOA, not the TA. Therefore, because there is no evidence of discriminatory intent on the part of the TMed doctors or Dreyfus, and because there is no evidence to connect the TA to any of the actions involved here, the claims against the TA are dismissed as well.

### (9)

### Concluding Thoughts

There is little doubt that this litigation is the result of the unwarranted confrontational tactics adopted by plaintiff and perhaps recommended by her attorney. Concerned about the risks her job posed to her pregnancy, in her first relevant contact with her employer, plaintiff threatened litigation if SIRTOA did not accommodate her desire for restricted duty. *See* Pl.Ex. 6. Then, in fulfillment of her dire predictions of "a serious liability exposure" for SIRTOA, *id.,* plaintiff quickly filed an EEOC complaint and then duly commenced this litigation. Defendant justifiably attempted to shield itself from the liability to third parties mentioned by plaintiff and possibly to plaintiff herself. Understandably, but unfortunately, goaded by plaintiff's counsel's tactics, it chose a response that has only managed to increase its legal exposure. Together, the parties have created an atmosphere from which only lengthy litigation with its attendant risks seems able to extricate them. Somewhere in this tale, there is a lesson to be learned.

### Conclusion

As set out in the analysis above, defendants' motion to strike portions of plaintiff's evidence is denied. Defendants' motion for summary judgment on Counts Three and Four—alleging claims under the ADA and RA, is granted, as is defendants' motion on Count Five—alleging a claim under Title VII based on a theory of disparate impact, Count Seven—alleging

due process claims, and Counts Two, Six and parts of Twelve—alleging retaliation. Furthermore, all claims against the Transit Authority are dismissed as defendants have moved. However, there are genuine questions of material fact with regard to Dimino's other discrimination claims. Therefore, summary judgment is denied for as much of Counts One, Two, Eight, Nine and Twelve as allege that the defendants unlawfully refused to allow plaintiff to work (see part (1)(i)). Summary judgment is otherwise granted on plaintiff's claim that she was denied restricted duty although it had been available to others (see part (1)(ii)). As defendants' motion for summary judgment on Counts Ten—seeking declaratory relief, and Eleven—seeking injunctive relief is, according to defendants, dependent on the resolution of the plaintiff's remaining theories for recovery, summary judgment is not appropriate on those counts.

SO ORDERED.